Our first case of the afternoon, which is actually part of two consolidated cases, is 4-14-0255 Larson v. Provena. For the appellant, Mr. Goldberg and Ms. Milligar, is that the right pronunciation? Mr. Goldberg will be arguing, and for the appellee, Mr. Honig? Yes, Your Honor. Is that correct? Yes, Your Honor. Pronunciation? Yes, Your Honor. Thank you. Mr. Goldberg. Thank you. May I please inform the counsel? Dr. Larson comes before this court today for a clarification on a phrase, a willful warrant, and its interpretation in the Lowe v. Provena case. Dr. Larson brought a complaint for breach of contract, fundamental unfairness, whistleblower, and tortious interference. The trial court judge dismissed without prejudice the fundamental fairness claim, dismissed with prejudice the tortious interference claim, and allowed the whistleblower to go forward. What the judge got hung up on with the breach of contract case is this willful and warranted definition in the Hospital Licensing Act. The judge allowed us to, the injunction part of the breach of contract survived, so Dr. Larson is allowed to, in essence, force his way back to having a hearing at the hospital. But when we were arguing in front of the judge, and this is in the record at C-48, the judge says, I'm bothered by the harm, but then with the other sentence immediately following it, his safety was not at issue. So the judge is interjecting at that point in his making a decision the language at the end of Lowe, which says plaintiff has alleged no facts and has offered no evidence from which we could reasonably infer the defendant actually or deliberately intended to harm him. I was arguing that's a separate thought. That's a separate idea. And then it would read, and in addition, his safety was never an issue in this case, but that's not how it reads in Lowe versus Provena. It says, the next sentence says, his own safety was never an issue in this case. And so the judge is bothered by the fact that he believes those two sentences are connected, which leads to the conclusion that the doctor, in the judge's mind, has to show not financial harm or harm to his reputation, but actual physical harm to himself. So I say to him, are you interpreting this to say that the harm means it has to somehow be the doctor's own personal safety? And the judge says, well, when I read it, it says plaintiff has alleged no facts and he reads the language. And then counsel for the defendant sort of helps the judge along and helps us get to what we mean. And he says that second sentence goes to explain the first. And I say, yes, that's a good way to put it, rather than being utterly independent, which is what I thought that it was. And then the judge says, so what I'm reading is that they were saying, when he's saying they, he means you, that damage financially and harm his medical practice and professional reputation was not the harm they were talking about. Then we go on to argue a little bit and we sort of crystallize what the issue is. And I immediately asked the judge, or suggested to the judge, that we have 308 language, which would help clarify in my client's mind and I think in the court's mind, what that willful and wanton means. So when a doctor is suing a hospital, there is limited judicial review. The court can only look to see if the bylaws were followed. We would argue, based on Atkins and some other cases, that there's a fundamental unfairness issue as well. It's not an issue in this case, though. So what we're dealing with is when a doctor sues a hospital and is saying there's a breach of the contract, which is the medical staff bylaws. So it's not quite that simple as in the normal breach of contract case, because in addition, you have to show willful and wanton conduct. Now, our contention, which is agreed upon by the defendants, is that what the legislature did was they copied and pasted the willful and wanton conduct definition from the Tort Immunity Act and pasted it into the Hospital Licensing Act. So the language of the willful and wanton makes perfect sense for the Tort Immunity Act, because it talks about either, A, you're showing an actual or deliberate intention to harm the plaintiff. Okay, so aren't you really arguing that our decision in Lowe was wrong? Yes, I am. If we disagree with you, then our choice is our decision in Lowe was correct, and we're going to adhere to it, and that would be the end of it, if that were to be our position? Yes. Well, here's the thing about Lowe. Lowe was decided nine years ago. 2005. If we were wrong in Lowe with regard to allegations of physical harm being required for the immunity, why hasn't the legislature addressed the error of this court and corrected it? Judge, just as I can't answer that question, all I know is that I have lost many emotions to dismiss in these types of cases and have not been able to have a client willing to spend the time or money to appeal. I don't think the outcome of Lowe has to be different in what happened with him. The facts of the case are totally different, but absolutely. Well, let me give you – I want to be clear in my understanding of the sequence of events here and let you have a chance to address it. Lowe was decided about nine years ago, and there's been no legislative action on it. In the Zerbeniuk case, dealing with the same statute, the second district concluded that the prior version of section 10.2 of the Hospital Act did not provide immunity for individuals, quote, acting only pursuant to an informal delegation of authority by an uninformed committee. The legislature didn't like that decision. They went back and they changed it almost immediately within a matter of months to provide immunity for individuals. That's obviously how things should work when the legislature disagrees with an interpretation that the courts have come up with. In the very same statute that we're construing here, nine years ago, we construed Lowe as we did. Why doesn't the silence of the legislature speak volumes about the fact that we must not have been too wide of the mark given, one, the Zerbeniuk precedent, and two, the fact that it's not a legislative fiction, the notion that, gee, the legislature is supposed to know about what we're doing and if they don't like it, fix it. Particularly in this area, because this is where the big boys play. The medical society, the doctors, the trial lawyers, they watch this stuff real carefully as the Zerbeniuk decision made clear. Given all that, why should we conclude now that, you know, we were wrong in Lowe and the legislature just didn't get around to fixing it? Okay, I want to clarify how you were wrong. No, actually, the question I raised is the one I'd like you to address. How do you explain the legislative inaction? Well, because the language in Lowe is inartfully drafted. The statute doesn't need to be changed. The statute contains a disjunctive. The willful and wanton says already that one way to do it is to show that they intended to harm our client, which we have. Well, counsel, let me explain it this way. If you were asked by the legislature or some committee wanted to address this and say, where did the fourth district come up with this crazy decision about physical harm? That's bad. We have clients that have to be protected, says the Medical Society in this example. I have no doubt that you and I and other lawyers addressing this could have proposed a bill that would have clarified this matter to make it clear that the interpretation of this court in Lowe was wrong. They didn't do that. Why shouldn't we infer from their silence that maybe we weren't wrong in Lowe and adhere to it? Because the language in Lowe means different things to different people. Well, no, it didn't. As of nine years ago, Lowe meant one thing to this court, and it hasn't been changed. Now, it might mean different things to lawyers arguing the case, but we are the definitive word in Lowe on what the phrase at issue here means. The legislature could have changed it just as they did in Zurbaniak. Why didn't they? Justice Steinman, I have to go back to the fact that if you simply read the judge in Edgar County is asking this court to answer what it meant by this language, you could simply say we didn't mean to say that by using the words his own safety was never an issue in this case. We weren't describing the sentence before. It was a separate idea that would negate any need for anyone to make any legislative change at all. That's assuming we were wrong the first time. I don't think you were wrong. I think the way it was drafted was wrong. I don't think that the people that drafted this language meant to say that the doctors, the only way that a doctor could sue a hospital for a wrongfully kicking him out, as we have done, is to show that he was physically in danger. I don't think that was the case. That's what we said. Isn't that correct? No, that's not what you said. Physical harm needs to be shown. No, you said no. You said what you said was plaintiff has alleged no facts and offered no evidence from which we could reasonably further defendant actually or deliberately intended to harm him, which I take as if we would have ended there. The case would be aligned. Then the next sentence says his own safety was never an issue in the case. That's a separate thought. It's a separate concept. If you would tell the judge that's what was meant, everything would be clarified and the statute could stand as it is. Doesn't sound like physical harm is a requirement. Is that what you're suggesting? Correct. From Lowe? Right. I thought you said Lowe was wrongly decided. Inartfully drafted. Uh-oh. Well, wasn't the allegation in Lowe, though, that the physician was not given an opportunity to be heard? Yes. And if there was just an outright denial of the opportunity to be heard, why wouldn't that constitute at least sufficient for pleading purposes, a willful and wanton conduct? Oh, very often it would. And I think in this case, we have that. In Lowe, the. Okay. But let me finish that, right? But the Lowe court said that there were no facts alleged that could reasonably infer that there was actual intended harm, which is a fancy way of saying no facts which would support willful and wanton conduct. And so it appears that Lowe used that language along with the following sentence, which you're saying was a separate sentence. It appears that Lowe can only be read to tie those two together, and that is intentional physical harm was necessary. I think the thing about Lowe is it turned on the fact that, A, he was grandfathered in by the exclusive contract. So there was no harm, not because he wasn't beaten with a baseball bat, but because the exclusive contract didn't affect him. And the second thing is that he agreed to the restrictions initially. And there was also a mootness issue running through some of Lowe, because they didn't contend that the summary suspension was wrong with the refusal to renewal. So this court said, if you would have brought those issues to our attention, perhaps we would be considering them. So they said that you didn't allege any harm because there is no harm. I don't think that the Lowe court meant you didn't allege harm because you didn't suffer physical injury. It just wasn't there factually. In this case, we would argue that we have alleged harm. So your argument basically is that if you just put the word additionally in front of his, that that is what the Lowe court meant. Yes. Right. I would probably still want to draft it differently, but if that's all you did, that would give the judge in our case direction on the type of harm, the type of intentional harm that could form the basis of willful and want. And is I think what you're implying that the answer just starting this question is about why didn't they take care of this across the street? Is that maybe some of the lobbyists, legislators are reading it as if the word additionally does precede the word hits. Right. Correct. And if you look at the though it was in the past, Adkins is an Illinois Supreme Court case that existed before the definition of willful and wanton existed in the in 10.2. But they talk about to sufficiently plead willful and wanton misconduct. The plaintiff must allege either a deliberate intention to harm him or an utter indifference to a conscious disregard for the welfare of the plaintiff. So they're saying that that that definition would work beautifully. Why the legislature didn't just lift the Supreme Court's definition from Adkins and instead went to the Tort Immunity Act probably has more to do with how our legislature works than crafting the best language. What specific site are you referencing with regard to how this was lifted, cut and pasted from the Tort Immunity Act? Well, verbatim, I just have the verbatim. Yeah. And it's something that we both argue in our briefs. So we're both are conceding that. But I don't have anything. I don't think I don't have the legislative history. I just have the verbatim language. For verbatim language from the Tort Immunity Act, what's the citation? Are there several different ones? It's 1401 willful and wanton conduct. OK. So, you know, our contention is that if you if you look at the nature of the types of cases that are brought. They want peer review to happen at hospitals. That's for patient care. That's for all of our benefit. So no doctor is going to engage in peer review of another doctor if he or she knows that they're going to immediately be able to be sued without any protection. So they have struggled by first saying hospitals and then saying individuals and then putting in an actual definition of willful and wanton to give the reviewers, be they a hospital, a subcommittee of the hospital, the medical staff, subcommittee of the medical staff or an individual. As long as they're acting in peer review in good faith, there is this immunity. But it's not absolute. And as important as it is to have peer review, it's also important to know that the peer review is not for bad reasons, is not to get rid of a doctor who's complaining about patient care in a way that might cost the hospital money to fix. Fixing it, you get rid of the doctor. If that were the case, that would be just as damaging to patient care as not having a peer review. So they want there to be a peer review. There needs to be a peer review. There needs to be protection. But it's not absolute. And if you look at the if you if you read the way the court suggested, maybe it should be in the way the defendants want you to, then you would have hospitals that could follow the that didn't follow the bylaws. Don't give you a hearing or don't let you bring witnesses, don't let you cross examine, whatever. And and then don't physically hurt you or don't try to physically hurt you. And you don't have a lawsuit. That's not what the legislator said. Legislature said. And when when this court dismissed Dr. Lowe's case, that's not why you dismissed it. You dismissed it because he didn't allege the type of reputation or professional or financial harm that would be necessary. And that's why. And it's just because that last paragraph was inartfully drafted that and could use it additionally, that this court and other courts have have dismissed based on this absurd idea that you have to be physically harmed or physically threatened to bring a lawsuit. And that's we're asking that you clarify that. Thank you. Thank you. Thank you. Thank you. Decided correctly. Lowe was decided correctly. And the second phrase is safety was never an issue. Describes the first. The two don't exist in a vacuum. As the trial court noted, the court did not start. And in its opinion with plaintiff has alleged no facts and has offered no evidence from which we could reasonably infer the defendant actually or deliberately intended to harm him. His own safety was never an issue. So you really low is speaking about the need for allegations of physical harm. That is correct. Assuming you're right. One of the interesting and arguably nice things about being on the appellate court is not only are we not bound by decisions of our sister districts, we're not bound by our own decisions from last week, much less nine years ago. So, were we right to decide low as we did and what sense does it make with that interpretation. The court was right to decide as it did. And it was right for a couple of different reasons. The first reason is highlighted by something that was raised. Highlighted by what? By something that was raised a couple of minutes ago by by by Dr. While we agree that the willful and modern language tracks the language of the jury instruction. I think it's very important to note that the willful and modern language actually does not track the legislature's language in the tort immunity. The difference is small, but very important right now. And if I may, that language defines willful and modern as a course of action, which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. The legislature clearly knows how to say or their property. And they did not. It does not track the Tort Immunity Act. It is different. It accepts property. Second, as acknowledged by both sides. By the way, I think that the Tort Immunity Act was in existence for several years before the Hospital Licensing Act. Yes, the one that I read was effective as of 1998. And the amended Licensing Act that is the subject of this was amended in 1999. Okay, go ahead. Second, and I think this really gets not to what words were chosen, but what's the right thing to do. I think that's really the question. Will we write? Dr. Larson himself admits that peer review actions, negative peer review actions, and nobody brings a claim for a positive peer review result. Negative peer review actions, by their very nature, cause economic and reputational injury. If all negative peer review actions cause economic and reputational injury, and economic and reputational injury is sufficient to find a willful and wanton act, then all peer review actions are willful and wanton acts. And there is no immunity. Now, one of the turning points on the argument that I think is important to note is that the Act does not limit itself to injury to the physician. It doesn't limit itself to injury to the physician because the Act is not about the physician. The Act doesn't say injury to the physician. It says injury to the physician or others. Why others? Because the Act is about patients. It is about patient care. It is about patient protection. The General Assembly made a decision. The decision was, one, we're not doctors, and we don't know how to treat these doctors. Two, there is nothing more important than the health and safety of the people of Illinois. Three, the way the health and safety of the people of Illinois is protected is through peer review. Four, if we don't do something to keep the doctors conducting peer review from feeling like there's someone looking over their shoulder at all times, they won't conduct peer review. Therefore, we're going to immunize them. In their entirety, no. The statement that they would not have a lawsuit is incorrect. They are only immunized from monetary damages. Dr. Larson himself continues to have a lawsuit under the Licensing Act. He has a remedy. His remedy is injunctive relief. His remedy is not a civil one. What does that mean? If he wins, what's his remedy? If he wins, his remedy is to require the hospital to either provide him a hearing in accordance with the bylaws, because if he wins, he will have demonstrated that it wasn't in accordance with the bylaws, or to return his privileges. Is that because of his contract with the hospital? The bylaws are a de facto contract. Even though the bylaws are medical staff bylaws, and so they're not a contract between the doctor and the hospital, for these purposes they are treated as a contract, which is why these claims are treated as breach of contract. But the reason I ask that is the Hospital Licensing Act itself provides no such remedies. These are contractual remedies through the bylaws that the doctor has in this case as he's claiming. The Hospital Licensing Act doesn't define any remedies at all. The Hospital Licensing Act merely limits remedies. And if one of his remedies is not monetary, then all other remedies would be available to him, which he could demonstrate he is entitled to. In this case, the cases that have been cited, frankly, by both parties, have said that the Licensing Act does not limit all remedies, that injunctive relief is still a possibility. The only thing that is not available is monetary remedies, is a civil remedy. Well, actually it says willful and wanton misconduct, if that's shown, can be a basis for monetary damages, can it not? Willful and wanton misconduct can. As defined? Yes, the question is how is it defined. Okay, so, but here's the tricky thing, and this is part of the argument I think Mr. Goldberg made. Give me an example in which Dr. Larson or any other physician under the Hospital Licensing Act would be able to bring a cause of action for damages for his own safety or the safety of others, pursuing where this willful and wanton exception to immunity wouldn't apply. Sure. Because I'm having trouble figuring out what that would be. Okay, safety of others. If a hospital for malicious purposes bars the only obstetrician within 100 miles from practicing at the hospital, the safety of others would be threatened, because there would not be an obstetrician available. Who would be bringing this cause of action, the doctor? If at that point the malicious act was taken against the doctor, he would have a claim. Okay. Because he would fall outside the immunity. That would be the safety of others. That would be the safety of others. Okay, now what about the safety, the person's own safety, I guess, there would be someone in the position of Dr. Larson, would it not? It would. Okay, give me an example of how that could work. I don't have one. If the statute merely said his safety, I wouldn't have the argument, but it doesn't. Of course, the problem is that we're running against another judicial dictum of legislative interpretation of don't disregard any words in the statute. Yes. And you're telling me essentially that you're disregarding the words for a person's own safety because you, like me, can't think of a situation in which the doctor plaintiff would have his own safety at issue. No, I'm not saying they should be disregarded or given no effect. I'm saying that because the words safety of others were already there, and because I put what limited mental capacity I had to thinking of one of those examples, I didn't look any further into finding another. But you're not able to provide any for the doctor himself? I don't know. If I sit here and think for a minute, I can't tell the court that I would, but it's not something that I've actually given a great deal of thought to. How about the physician has a heart attack upon learning the news that her privileges have been taken away? I don't think that you could actually say that that was the intent or that there was utter indifference, unless, if you want to stretch the example, the hospital knew that the doctor had a very weak heart and that it was very likely or even possible that a heart attack would result from the action. So you're saying there could be something really remote out there where it might actually apply? There could be, and there may be something even not so remote. I simply haven't put my limited capacity to thinking of it. I want to see if I understand your argument also with regard to the definition at the end of Section 10.2 of lawful and lawlessness. Is it your position that if it weren't limited, that it wasn't limited in its construction as we did in Lowe and as Mr. Goldberg says we shouldn't adhere to it, that that would open up in all cases whenever a hospital committee made a determination to restrict hospital privileges that the doctor involved could always sue? Yes. What about the notion that it has to be actual or deliberate intention to harm or utter indifference? You think that that is something which could always be pled nonetheless and a lawsuit could proceed on the basis of what was the hospital's intent from this committee and so forth? That is the definition that Dr. Larson is encouraging you to take. His position is, and these are his own words, the inherent nature of medical peer review is such that it always has the potential for resulting in some level of damage or injury to a physician's medical practice and professional reputation as well as concomitant financial damage. The potential harm... You're reading from something. I am reading from Dr. Larson's brief in this case. Go ahead. He goes on to note that the potential harm to the physician will always be in the form of injury to professional reputation and medical practice because the physician standing within the medical community in which he works will be tarnished. So he's suggesting a bootstrap definition. He is suggesting that the hospital knows that the injury that will result from the peer review is always economic and reputational. Step one. Step two. Economic and reputational injury is sufficient to find willful and wanton action. Therefore, all peer review, knowing that economic and reputational harm will flow, is willful and wanton. Well, I suppose what he's saying is the doctor is always going to be harmed by having his hospital privileges taken away. And the hospital will always know that because it's inherent in the act. So does that then fall within the definition of an actual or deliberate intention to harm? If it does, there is no immunity. Therefore, I suggest that it cannot. Because the doctor would always say they did it because they didn't like me and they knew harm would result? Nobody brings a peer review action because their medical practices were being reviewed. They bring a peer review action because they were being unfairly disciplined for some other reason. At all times, the hospital knows that the result, if it's negative, will have an economic result. If that's enough, there's no immunity at all. And that's why the court was right in love. Because not all remedies are gone. Only this one remedy is gone. And this one remedy is gone because neither the General Assembly nor the courts want what Dr. Larson wants. Which is, in his words, for a court and a jury to decipher the purpose of the peer review. And by that he means it was nefarious? What was really behind this? What were you really wanting? What was your intent? So the question he wishes to present to a jury is, was this a legitimate resolution taking away my privileges because of my failure to do what I should? Or was it because I was being punished for being a whistleblower or pointing out deficiencies? For being a whistleblower, in this case, for defamation in the... Oh, I had it and I was so ready to say it. And then of course I lost the word because of that age where nouns disappear. But in another case... Cardwell. Pardon? Cardwell. Whether it's because another doctor came in under an exclusive contract. Low. There's always a reason. And so what the General Assembly said, in concurrence with the courts, let's say we don't want to replace the decisions of hospitals, was unless you can show actual injury, not injury to property like in the tort immunity act, actual injury, we're going to leave that to hospitals. You can go get a hearing again or you can go get your job back, but we're not going to chill peer review because we are more concerned. We've made a decision. We're more concerned about the health and safety of the people of Illinois than your monetary award in a civil action. And that's a decision that the legislature can make. But you're arguing, if I follow that to the logical conclusion, that the legislature has a problem with showing willful wanton conduct that causes reputational damage to the doctor. Why would the legislature condone willful and wanton conduct? I respectfully must disagree because the legislature defined willful and wanton conduct to not include reputation. They've defined willful and wanton conduct to include injury or damage. You argued a minute ago that if you read it the way the doctor wants you to read it, there is no immunity. But to me, there's still immunity. Just not immunity if willful and wanton conduct is exercised by the hospital. And if it is, then the doctor is entitled to damages for the reputation loss, monetary losses and suffers. But why wouldn't that make sense? Because the willful and wanton conduct alleged, Dr. Larson has made it very clear that the willful and wanton conduct he's alleging under the licensing act is separate from what we're going to talk about a little later. Because the willful and wanton conduct he's arguing in this case is taking action against his privileges with knowledge that it will hurt him economically or reputationally. Well, normally in a willful and wanton conduct case, if it can be proved, a plaintiff in such a case could receive damages to reputation and monetary damages and the like, correct? I don't believe so. Normally, most of the time that you see willful and wanton conduct being brought in, it's brought in when it's being balanced against negligence. And most of the cases that involve willful and wanton conduct, and particularly the cases that discuss willful and wanton conduct allowing for punitive damages or contract, and we're talking about a contract here. So you're saying the type of damages that I just described to reputation, monetary and the like would be compensated under a negligence theory and the willful and wanton therefore would involve only punitive damages? Would involve more, that the willful and wanton acts are greater. Where you see an intersection of willful and wanton and contract law, the courts in Illinois have pretty clearly stated that applies to personal injury or injury to property and not to economic injury. Now, those cases apply to the application of punitive damages where you still have a contractual remedy, but here we're still talking about whether they're immune from a contractual remedy so that the results are different, but the intersection is the same. The intersection between willful and wanton and contract actions is one that only allows a consideration where there is physical injury or damage to property. So punitive means punishment, and the legislature has decided that if willful and wanton conduct is engaged in by the hospital, their punishment is you've got to give them a hearing now. That's it. Now, where there's willful and wanton conduct that rises to the level described where the definition ends with injury or danger to oneself or others, in those cases there isn't immunity. Where there is immunity, where it does not rise to that level, where you're outside what this court properly decided in Leno, then you're entitled to civil damages. I think I'm, am I out, or? No, it's not quite written. No, it's humans. Where I was going at the very beginning, and I think it's worth coming all the way back full circle and pointing out, is that the court did not interpret Lowe based on those, the trial court did not interpret Lowe based on the two sentences this court gave on Lowe, and this court did not interpret Lowe based upon those two sentences. If you look at the trial court's ruling, it read those two sentences, the second being that safety was never an issue in this case. And the question was, does that describe the first sentence, or should it have been another paragraph? We have probably a better way of putting it. The trial court read the rest of the Lowe decision and said, noted that the court went on to describe the injury in Lowe as financially, the defendant harmed him financially and harmed his medical and professional reputation. That is the injury, specifically the injury this court rejected in Lowe. It wasn't merely he wasn't hurt.  And did it for the reasons that I've stated. Thank you, counsel. Thank you. Good model? Yes. I have a couple of points to make. First is, in Mr. Horning's discussion with Justice Steigman of Wilford and Warren, you both used the word or in between person's own safety and safety of others, but it actually says and. I think the only way this makes sense is in the personal injury conduct where I deliberately intend to harm you by running you over with my car, or I show such an utter indifference or conscious disregard for a person's, and I wouldn't say person's, is meant the plaintiff. I think it's the defendant. So if I'm drunk and I'm speeding through the intersection and I know my brakes are at fault, I'm having a conscious disregard for my own safety and the safety of others. So this definition works perfectly in another setting, but it doesn't work at all in this setting. A doctor is not always going to be able to bring a case under Wilford and Warren, and I want to address that concern because that might be. Why not? Well, because the doctor comes to my office and he's been summarily suspended from doing colonoscopies, and he had two people die within two weeks of doing colonoscopies, and he wants to do this and go in for injunctive relief, but the point is that that's peer reviewed within the language of the Hospital Licensing Act. He might think the case isn't a sound one, but that's not the question. The question is, is it a colorable claim to say, you've, by denying me my privileges, you've damaged my reputation. I'm suing you. Why couldn't any doctor who's been denied hospital privileges always make that claim? His reputation is always going to be harmed. The person that gets hit by the car is always going to be injured, but it doesn't mean that the conduct by the defendant is going to be actionable. In the hospital setting, there are a set of bylaws that you follow. There are protections, and if they're followed, then... First of all, if the bylaws are followed and you get a hearing in the right time with the right amount of witnesses and the right amount of... Counsel, let me be clear. When you're providing immunity, that's the short-circuit litigation. You know better than I, and as does Mr. Honig, that if you can't short-circuit litigation, summary judgment, or motion to dismiss, motion to dismiss of the 2619 here, affirmative matter, then 95% of the cases are going to have to settle because you can't afford to go to trial. So when we're talking about immunity, we're not talking about the strength or weakness of a case. We're talking about a case that theoretically can be brought at all. Mr. Honig asserts any doctor's privileges have been denied can always have a colorable claim. What I want to know is why isn't that correct? Why wouldn't any doctor's privileges have been discharged always have a colorable claim under this definition of willful and wanton as you claim it should be construed? Well, the best example is Lowe. You're not excluded by this exclusive contract, and you agree to this restriction. There's no willful and wanton conduct on behalf of the defendant. Defendant is just normal person. Well, I think in Lowe, we talked about physical harm, Counsel. I think that's the difference. But give me an example of a case where a doctor's been discharged, and he wants to bring a colorable claim, and he wouldn't be able to say, hey, this harm to my reputation has been devastating. Because you have a drug or alcohol problem, and you show up to a surgery as drunk, and they summarily suspend you. That was a pretext, says the plaintiff. That had really nothing to do with it. I want a trial. I want to have the jury decide this. Well, but does willful and wanton mean... Can a trial judge throw it out? Absolutely the trial judge could throw it out, and they would try. On a summary judgment basis? Why wouldn't that be a matter of second guessing? It would be 2619, because the bylaws were followed, because there was an identifiable problem. What happens is you see the people who are summarily suspended for something that happened a year ago, or for failing to respond to a page, or for making complaints about patient safety. Yes, those people will be able to bring their claims under the law, and the law wants them to. But the vast majority of peer review is going to be for real problems. And they're going to follow the bylaws, and there's nothing to bring a lawsuit on. You'll be dismissed. Thank you, counsel. We'll recess, please.